Titone, J.
(dissenting). At issue in this appeal is the relationship among the various remedies that article 2 of the Uniform Commercial Code provides for buyers aggrieved by sellers’ defaults. Central to the analysis is the principle that the Code’s remedies "shall be liberally administered to the end that the aggrieved party may. be put in as good a position as if the other party had fully performed” (UCC 1-106 [1] [emphasis supplied]). Here, the majority has concluded that the aggrieved buyer may retain both cover damages and the profit from the resale of the late-delivered goods, in effect, securing the benefit of its bargain twice. Since that result is not required by, and indeed is not even consistent with, the purpose of Code’s generous remedial provisions, I must respectfully dissent.[1]
I begin with the premise that an aggrieved buyer who has purchased substitute goods and sued for "cover” damages under UCC 2-712 has impliedly rejected the seller’s nonconforming performance and, consequently, holds the seller’s goods only as security for any prepayments made to the seller (see, UCC 2-706 [6]; 2-711 [3]). I find the contrary position— that an aggrieved buyer may compatibly resort to cover and also retain and resell the nonconforming goods for its own account — to be legally insupportable and economically unsound. The "cover” remedy represents a recognition by the Code’s drafters that a buyer aggrieved by a breach or repudiation "may not be made whole by the mere recovery of dam *86 ages, because he is left, thereby, in a position in which he does not have the goods he wants” (3 Hawkland, Uniform Commercial Code Series § 2-712:01, at 360). The Code’s "cover” provision, which authorizes the buyer to purchase equivalent goods in the open market and then sue the breaching seller for any price differential (see, UCC 2-712), was intended as a practical method of furnishing the buyer with a fair substitute for the goods it bargained for but did not receive. Thus, from an economic standpoint, the buyer receives the full benefit of his bargain when he obtains cover damages under UCC 2-712. Allowing the buyer to retain and resell the goods in addition obviously leads to a windfall, since the .buyer is receiving more than the benefit of the transaction it bargained for.
Moreover, the language óf the Code makes clear that the buyer cannot both sue for cover and accept the goods. UCC 2-712 (1) defines "cover” as a purchase of goods "in substitution for those due from the seller” (emphasis supplied) and authorizes an aggrieved buyer to resort to cover only "[a]fter a breach within [UCC 2-711 (1)],” which specifically states that cover "under [UCC 2-712 (1)]” is available when "the seller fails to make delivery * * * or the buyer rightfully rejects or justifiably revokes acceptance” (UCC 2-711 [1]). Finally, any doubt about the applicability of the cover remedy referred to in UCC 2-711 is dispelled by comment 1: "The remedies listed here are those available to a buyer who has not accepted the goods or who has justifiably revoked his acceptance” (emphasis supplied).
In short, consistent with its purpose, the cover remedy is, by its terms, available only in situations where the buyer either does not have the needed goods because of nondelivery or cannot use the goods that were delivered because of a defect in the seller’s performance. In all other situations, the aggrieved buyer must resort to the remedies provided in UCC 2-714, which concerns nonconforming goods that have been accepted (see, UCC 2-711, comment 1). While there are instances in which an accepting buyer may also seek cover damages under UCC 2-714 (1), even the commentary the majority cites makes clear that the cover remedy is not intended to be used with respect to those nonconforming goods that the buyer has received and accepted; rather, the remedy is properly used only to replace the portion of needed goods *87 the buyer either does not have or does not take (3 Hawkland, op. cit. § 2-714:05, at 384-3S5).[2]
Viewed within the framework of these basic principles, cases such as this one involving late delivery are not difficult to resolve. As in cases where there has been a total failure to deliver, the buyer in late-delivery cases may reject the untimely performance and cover with substitute goods. Additionally, unlike the buyer aggrieved by a total failure to deliver, the buyer aggrieved by a late delivery has the alternative option of accepting the belatedly delivered goods and retaining for itself any profit realized on resale. However, contrary to Fertico’s claims, the aggrieved buyer may not pursue both courses simultaneously, since it would then benefit twice from what was a single bargain — a result that is unacceptable under UCC 1-106 (see, Melby v Hawkins Pontiac, 13 Wash App 745, 537 P2d 807 [alternative remedies may be pursued under UCC, but not where double recovery would result]).
The majority has attempted to rationalize that result here by relying on a damages rule that has previously been applied only to aggrieved sellers. The rule permits a seller who regularly deals in goods of a particular type to sue the breaching buyer for lost profit even though the wrongfully rejected goods have been sold to another buyer without loss. The rule applies only where the seller has an unlimited supply of standard-price goods (see, Neri v Retail Mar. Corp., 30 NY2d 393, 399-400; 3 Hawkland, op. cit. § 2-708:04, at 331-332). In those situations, "it may safely be assumed that” the seller would have made two sales instead of one if the buyer had not breached, and, consequently, it can fairly be said that the buyer’s breach deprived the seller of an opportunity for additional profit (3 Hawkland, op. cit., at 332). Thus, tradi *88 tional remedies such as resale or market price differential are "inadequate to put the seller in as good a position as performance would have done”, and the seller may sue for the lost profit (UCC 2-708 [2]).
The Code, however, does not contain an analogous provision allowing aggrieved buyers to recover profits from lost sales, and there is good reason for that omission, since neither of the conditions necessary for application of the sellers’ lost-profit remedy may be satisfied in the case of an aggrieved buyer. First, a party in the position of a buyer cannot, by definition, be said to have an unlimited supply of the goods at his disposal for resale; even where the goods are fungible, the buyer who intends to resell must go into the marketplace to acquire the goods in the first instance.[3] Second, a buyer who must go into the market to obtain goods will ordinarily not be able to rely on the availability of a "standard price”; rather, unlike the seller who has ah unlimited supply of standard-price goods in its inventory, the reselling buyer remains at the mercy of the wholesale market’s price fluctuations. Because of these differences, it cannot "be safely assumed” that the aggrieved buyer-dealer would have made a second sale at a particular profit were it not for the seller’s breach. To the contrary, the occurrence of and profit on a second transaction would depend on such other, unrelated variables as the availability and wholesale market price of the goods at the time the buyer-dealer went into the market to acquire them. Thus, the rationale for the seller-dealer’s lost-profit remedy is simply inapplicable to buyer-dealers.
Indeed, this case illustrates the difficulty of applying the seller’s lost-profit remedy to aggrieved buyers. Were it not for Phoschem’s breach, Fertico would have delivered the 15,000 tons of fertilizer it had purchased from Phoschem to Altawreed and would have had to go into the marketplace again to acquire an additional 15,000 tons if it wished to make a second sale to Janssens. In this respect, Fertico’s position here is really no different in principle from that of an aggrieved seller which had only one set of goods at its immediate disposal. In both instances, the breach of a prior agreement is what has made the goods available for a second sale (cf, 5 *89 Corbin, Contracts § 1041, at 256). And, while a second sale may have been theoretically possible even without the breach, the uncertainties occasioned by the buyer/seller’s need to return to the marketplace for more goods of the same kind preclude the assumption, implicit in the majority’s holding (see also, Neri v Retail Mar. Corp., supra), that the second sale and its accompanying profit would have been made on the same terms even if no breach had occurred.
Finally, I cannot agree with the majority’s reliance on the supposedly "exceptional” circumstance that Fertico both "met its subsale obligations with the cover fertilizer and * * * acquired title and control over the late-delivered fertilizer” (majority opn, at 83). First, the basis for and significance of the majority’s conclusion that Fertico acquired title to the goods is left unclear. Certainly, the fact that Fertico had already paid for the goods cannot be controlling, since the Code clearly does not equate payment and receipt of the goods with passage of title. To the contrary, the Code expressly contemplates and accounts for these situations by permitting a wronged buyer who has rejected to retain and resell the goods in its possession to recover any down payment (UCC 2-706 [6]; 2-711 [3]). The Code also requires in these situations, however, that the buyer account to the breaching seller for any additional profit it has made on the resale (UCC 2-706 [6]). Nothing in the majority opinion satisfactorily explains why this remedy is insufficient.[4]
Furthermore, the majority’s emphasis on the asserted "exceptional facts” is unpersuasive because under the terms of the majority’s holding the outcome in a given case would turn, in large measure, on the fortuity of which party had possession of the goods after the breach. In the case of a simple late delivery the buyer will ordinarily have possession after the breach. Under the majority’s holding, that buyer may both obtain cover damages and resell the seller’s goods, retaining any profit for itself. In the case of a complete failure to deliver, however, the seller will ordinarily have possession of the goods after the breach. Under the Code, the buyer in such a case may obtain either cover damages or the goods (if they have been specifically identified to the contract), but not both *90 (UCC 2-716 [3]). Thus, the buyer aggrieved by a late delivery is placed in a substantially better position than a buyer aggrieved by a complete failure to deliver, although there is no apparent legal or commercial justification for the distinction. Even more seriously, a seller who completely repudiates is placed in a more advantageous position than one who merely delivers late. While both must pay cover damages, the repudiating seller may resell the undelivered goods in its possession for its own account — an option unavailable to the seller who has delivered, albeit late. Since I cannot agree with a rule of law that ultimately imposes a greater penalty on the less serious of two similar breaches, I dissent and vote to affirm.
Chief Judge Wachtler and Judges Simons, Kaye and Hancock, Jr., concur with Judge Bellacosa; Judge Titone dissents and votes to affirm in a separate opinion in which Judge Alexander concurs.
Order modified, with costs to appellant, in accordance with the opinion herein and, as so modified, affirmed.

. My disagreement with the majority lies only in its conclusion that the Appellate Division erred by offsetting Fertico’s damage award against the profit Fertico obtained on the resale of Phoschem’s goods. I agree completely with the majority’s conclusion concerning the proper application of the $20.50 per ton additional reimbursement that Fertico obtained from Altawreed.

. The commentary cited by the majority states, in pertinent part:
"Where the buyer accepts goods that are nonconforming because of a deficiency in quantity or a late delivery, subsection 2-714 (1) gives him the right to damages for 'the loss resulting in the ordinary course of events from the seller’s breach as determined in any manner which is reasonable.’
"In the case of a shortage of quantity, the buyer usually will establish his damages by covering. That is to say, he will go into the market and buy goods to substitute for those that the seller wrongfully failed to deliver * ** * In the case of a late shipment that otherwise conforms to the contract, the accepting buyer has no need to cover” (3 Hawkland, Uniform Commercial Code Series § 2-714:05, at 384-385 [emphasis supplied]).
In other words, while cover is not precluded when there has been a partial acceptance of a nonconforming shipment, it is used only to replace goods that were either not delivered or not accepted.

. Indeed, it seems somewhat ironic to recognize, on the one hand, the buyer’s right to go into the marketplace and acquire "cover” goods at an increased cost and, on the other hand, treat the buyer as a party in the position of a seller with an unlimited supply of goods at its disposal.

. That retention and resale of Phoschem’s goods was the most "commercially reasonable alternative” (majority opn, at 79) does not alter Fertico’s obligation under the Code to hold any profits made on the resale for Phoschem’s account (UCC 2-706 [6]; 2-711 [3]).